**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES MONTGOMERY,** | : | **CIVIL ACTION** |
| **JACQUELINE MONTGOMERY** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **MITSUBISHI MOTORS CORP.,** | : | |
| **MITSUBISHI MOTOR SALES OF** | : | |
| **AMERICA, INC. and ANNE STORK** | : | |
| **Defendants.** | : | **NO. 04-3234** |


Gene E.K. Pratter, J.          Memorandum and Order          April 27, 2006

Defendants Mitsubishi Motors Corporation and Mitsubishi Motors North America, Inc. (jointly, "Mitsubishi")[1] move to preclude the testimony of Anthony M. Gamboa, PhD, MBA, an expert witness proffered by the Plaintiffs in this case. If permitted to testify, Dr. Gamboa will present evidence with respect to Plaintiffs' economic damages.  For the reasons that follow, the motion will be denied without prejudice.

FACTUAL BACKGROUND

This action arises out of a fatal auto accident that occurred on July 23, 2002.  The Plaintiffs' son, Garrett Montgomery, was a passenger in a MY2000 Mitsubishi Montero Sport when the vehicle was struck by another vehicle driven by Third Party Defendant Anne Stork. The Montero rolled over, and Garrett Montgomery was killed.

---

[1]  Although the case is captioned against Mitsubishi Motors Corp. and Mitsubishi Motor Sales of North America, Inc.., the latter organization is now called Mitsubishi Motors North America, Inc.. Answer to Complaint at 1.  The proper name of this defendant, Mitsubishi Motors North America, Inc. shall be used throughout this memorandum.

The Montgomerys filed this Complaint on July 8, 2004, alleging that Mitsubishi caused their son's death by "the design and manufacture of a defective motor vehicle and because of Defendants' negligence, carelessness and reckless disregard for the safety of others."  Complaint at ¶ 13.  Mitsubishi answered the Complaint on August 19, 2004, asserting various affirmative defenses.  The parties conducted discovery, including taking the depositions of several expert witnesses.  Discovery has been completed.  Mitsubishi moves for an order excluding the testimony of Dr. Gamboa, and Plaintiffs have responded to the Motion.  Oral argument on the Motion was held on April 5, 2006.

FINDINGS OF FACT

1.      Dr. Gamboa has a doctoral degree in Guidance and Counseling from Ohio State University and a Master of Business Administration degree from the School of Business at the University of Chicago.  Gamboa Curriculum Vitae at 1.

2.      Dr. Gamboa has been employed by Vocational Economics, Inc. since 1977. Gamboa Curriculum Vitae at 2.  He has served as the company's Chief Executive Officer since 1991.  Id.

3.      Dr. Gamboa has authored over 100 publications with respect to vocational assessments, including studies about the effects of various injuries on an individual's earning capacity and vocational counseling.  Gamboa Curriculum Vitae at 3-13.

4.      Dr. Gamboa prepared two reports for this case.  Oral Arg. Tr. at 63:20-24.  The first report was rendered in January, 2005, and the second report was issued in November, 2005, on the day Dr. Gamboa's deposition was taken.  Gamboa Dep. at 4:22-25 (statement of deposing attorney Mr. Gray).

2

5.      Before preparing the January 2005 report, Dr. Gamboa reviewed Garrett Montgomery's transcripts from high school and the two years of college he had completed, as well as records related to employment.  Gamboa Dep. at 56:15-22.  Dr. Gamboa did not consult directly with the Montgomerys or with any friends or other relatives of Garrett Montgomery regarding what plans he had for the future.  Gamboa Dep. at 34:5-9.

6.      The January 2005 Report includes a "Worklife Probability" table which delineates a computation of lost earnings related to Garrett Montgomery's anticipated worklife.  January 30, 2005 Gamboa Report.  Using an annual base earnings estimate of $74,036, the Worklife Probability table sets forth an adjusted earnings amount for each year of Garrett Montgomery's working life from the age of 23 until the age of 89.  Id.  Each year's annual base earnings is multiplied by the probability Mr. Montgomery would be working during that year.  For example, the table indicates a 93.9% probability of Mr. Montgomery working at the age of 37 and a 1.4% probability of his working at the age of 89.  When aggregated, the total adjusted earnings loss is estimated to be $3,636,094.

7.      Dr. Gamboa prepared the January 2005 report based on the assumption that Garrett Montgomery would have completed his baccalaureate degree and would have become and remain employed for the remainder of his natural life.  Gamboa Dep. at 58:17-21.  At that time, although Dr. Gamboa concluded that Garrett Montgomery "clearly had the capacity to complete a baccalaureate degree," Dr. Gamboa had been given no basis to conduct an occupation-specific analysis with respect to Mr. Montgomery.  Gamboa Dep. at 60:12-17.

8.      A few days prior to preparing the November 2005 report, Dr. Gamboa discussed aspects of the case with counsel for the Montgomerys.  Gamboa Dep. at 34:13-14.  During this

conversation with the Plaintiffs' counsel, Dr. Gamboa was asked to re-do the vocational

economic analysis in order to take different consumption variables into consideration, and to

conduct a second analysis assuming that Garrett Montgomery would have gone to and completed

law school.  Gamboa Dep. at 87:3-11.[2]

9.      Based on the revised instructions from Plaintiffs' counsel, Dr. Gamboa prepared

a second report which, in addition to incorporating the elements of the January 2005 Report,

details differing potential earning capacities for Garrett Montgomery, depending upon whether he

(1) achieved a baccalaureate degree only, (2) obtained a more advanced degree, and (3) obtained

a law degree and practiced law.  November 30, 2005 Gamboa Report.

10.     The Defendants seek to exclude the presentation of either report, or any testimony

by Dr. Gamboa.

## CONCLUSIONS OF LAW

11.     Federal Rule of Evidence 702, which governs the admissibility of expert

testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto
> in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to the
> facts of the case.

FED. R. EVID. 702.

12.     In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the

_____

[2]  Plaintiffs' counsel apparently indicated to Dr. Gamboa that Garrett Montgomery had
expressed some interest in pursuing a legal career.  Gamboa Dep. at 87:9-11.

4

Supreme Court imposed upon district courts the role of a gatekeeper to "ensure that any and all scientific evidence is not only relevant, but reliable." ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc., 198 F. Supp. 2d 598, 601-02 (E.D. Pa. 2002) (quoting Daubert, 509 U.S. at 589); see also Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).

13.     When "faced with a proffer of expert scientific testimony . . . the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand and determine a fact in issue." Id. at 602 (quoting Daubert, 509 U.S. at 592).

14.     This gatekeeping function of the district court extends beyond scientific testimony to "testimony based on . . . 'technical' and 'other specialized' knowledge." Id. (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)).

15.     Federal Rule of Evidence 702, as interpreted in Daubert, provides "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability and fit." Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000). The party offering the expert testimony has the burden of establishing that the proffered testimony meets each of the three requirements by a preponderance of the evidence. ID Sec. Sys. Can., Inc., 198 F. Supp. 2d at 602 (citing Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999)).

**Qualifications of Dr. Gamboa**

16.     The first aspect of a Daubert analysis, whether the witness is qualified as an expert, requires a witness to have "specialized knowledge" about the area of the

proposed testimony.  Elcock v. Kmart Corp., 233 F3d 734, 741 (3d Cir. 2000).  The basis

of such knowledge may include "practical experience as well as academic training and

credentials."  Id.   This requirement has been interpreted liberally to encompass "a broad

range of knowledge, skills, and training."  Id. (quoting Waldorf v. Shuta, 142 F.3d 601

(3d Cir. 1998)).

      17.     Mitsubishi does not question Dr. Gamboa's qualifications to testify as

an expert witness, but rather argues that his opinions are not reliable and lack the required

"fit" for expert testimony set forth in Daubert.

      18.     Because the Defendants do not challenge the qualifications of Dr.

Gamboa, the Court need not address the "qualifications" prong of the Daubert inquiry and

concludes that Dr. Gamboa's qualifications are appropriate.

**Reliability of Dr. Gamboa's Opinions**

      19.     The second Daubert prong requires an expert's testimony to be reliable.

Id.  When an expert testifies to "scientific knowledge," the expert's opinions "must be

based on the 'methods and procedures of science' rather than on 'subjective belief or

unsupported speculation'; the expert must have 'good grounds' for his or her belief."  In

re Paoli Railroad Yard Litigation, 35 F.3d 717, 743 (3d Cir. 1994).  The Supreme Court

has noted that a district court "must have considerable leeway in deciding in a particular

case how to go about determining whether particular expert testimony is reliable."  Id.

(citing Kumho Tire, 526 U.S. 137 (1999)).  That is to say, a trial court should consider the

specific factors identified in Daubert where they are "reasonable measures of the

reliability of expert testimony."  Kumho Tire, 526 U.S. at 152.

20.     In considering whether there are "good grounds" for an expert's opinions, and, therefore, whether the opinion meets the reliability requirement, district courts are advised to look at a series of factors, including:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

In re Paoli, 35 F.3d at 742 n.8.  This list of factors "is non-exclusive and . . . each factor need not be applied in every case."  Elcock, 233 F.3d at 746.[3]

21.     Mitsubishi argues that Dr. Gamboa's opinions are not reliable because (1) Dr. Gamboa's estimation of Garrett Montgomery's work life expectancy as being 89 years of age is unrealistic; and (2) Dr. Gamboa's opinions regarding the level of education and employment and family choices that Garrett Montgomery would have obtained is unreliable because it is speculative and not supported in the record.

22.     The Defendants first argue that Dr. Gamboa's assumption relating to the work life expectancy for Garrett Montgomery is unrealistic because Dr. Gamboa assumed that Garrett Montgomery would continue working until he was 89 years old.  This is not,

---

[3] Nonetheless, to the extent the Daubert factors are "reasonable measures of the reliability" of an expert's testimony, they should be considered by the district court.  Elcock v. Kmart Corp., 233 F.3d 734, 746 (3d Cir. 2000).

7

however, an accurate representation of the data or of Dr. Gamboa's report.  Although the

table Dr. Gamboa presents does reflect income through the age of 89 years, the assigned

probability of collecting income at this age is quite small – 1.4 %.  Moreover, as Dr.

Gamboa explained in his deposition, the probability of employment at each age on the

table is less than 100%, and the inclusion of each probability of employment was

necessary to construct an appropriate worklife expectancy statistic.  Gamboa Dep. at

70:22-25; 71:1-3.  That is, the Worklife Expectancy table really represents a statistical

exercise constructed to estimate economic loss, and is not expected to reflect actuality.

The weight and credibility of the data relied upon to construct the table may be

challenged on cross-examination at trial.  However, the record evidence presented does

not suggest that the Worklife Expectancy table was created based on unreliable

assumptions.

23.     Mitsubishi next argues that the assumptions set forth in the November

2005 report regarding the level of education and employment that Garrett Montgomery

would have achieved is unreliable because it is founded on nothing more than speculative

assumptions set forth by Plaintiffs' counsel.  In support of their argument, the Defendants

cite to the following three cases: Elcock v. Kmart Corp., 233 F.3d 734 (3d Cir. 2000),

Benjamin v. Peter's Farm Condominium Owners Assoc., 820 F.2d 640 (3d Cir. 1987),

and Gumbs v. Int'l Harvester, Inc., 718 F.2d 88 (3d Cir. 1983).

24.     In Elcock, the defendant challenged, among other things, the reliability of

the methodology employed by a vocational consultant in assessing the level of disability

of the plaintiff, who had been injured after a fall in a retail store.  Elcock, 233 F.3d at 747.

8

The purported expert's vocational assessment consisted of testing the plaintiff's intelligence level, obtaining a work history, analyzing a "Dictionary of Occupational Titles" aptitude testing and conduction of search of the Dictionary of Occupational Titles to determine what jobs the plaintiff might have been able to perform.  Elcock, 233 F.3d at 746.  After conducting these assessments, the expert concluded, based only on his personal assessment, that the plaintiff was only able to work at a 50 to 60 percent capacity.  Id. at 747.  In finding this methodology to be unreliable, the court found that it could neither test whether the expert's methodology consisted of a testable hypothesis nor determine whether there were standards controlling the technique's operation.  Consequently, the court found that the failure of these two prongs of the Daubert reliability analysis rendered the opinion unreliable.

25.    In Gumbs v. Int'l Harvester, Inc., 718 F.2d 88 (3d Cir. 1983), the plaintiff was employed as a truck driver whose job responsibilities included delivering water by truck to the island of St. Thomas.  The plaintiff was injured when a truck he was driving ran off the road and fell down an embankment.  The driver sued the manufacturer of the truck, alleging that certain modifications to the truck made by the manufacturer had been negligently performed.  Gumbs, 718 F.2d at 91.  At trial, the plaintiff proffered a professor of economics as an expert witness, who testified with respect to the loss of earnings suffered by the plaintiff as a result of the accident.  Id. at 98.  Finding that the expert testimony should have been excluded, the court concluded that the expert's calculations were flawed because (1) they were on the plaintiff's remaining life expectancy rather than his work-life expectancy; (2) they projected the plaintiff's annual

income at more than twice the plaintiff's annual income for the four years preceding the accident; and (3) the calculations incorporated fringe benefits, but the plaintiff had never received fringe benefits in the past.

26.     In Benjamin v. Peter's Farm Condominium Owners' Assoc., 820 F.2d 640 (3d Cir. 1987), the plaintiff was a marine mechanic who injured his back after a fall down a wet staircase located in the common area of his condominium complex.  Unable to continue to work as a mechanic, the plaintiff quit his job, which paid approximately $24,500 annually, and began doing part-time mechanical work earning $250 weekly. Benjamin, 820 F.2d at 641.  The plaintiff then sued the condominium association, alleging negligence.  At trial, the plaintiff proffered a certified public accountant to testify as to his economic loss.  Id.  This witness estimated the plaintiff's loss of future earnings at $500,000, based upon a review of the plaintiff's tax return and various personal records, as well as a personal meeting with the plaintiff.  Id. at 641.  In considering whether the testimony should have been excluded, the court focused on the accountant's lack of qualifications to make such an assessment, noting that the witness "had neither training in vocational rehabilitation nor professional knowledge as to [the plaintiff's] capacity to continue working in a particular job."  Id.  at 643.  Because the expert's opinion was not based upon a proper factual foundation and was "merely speculative," the court found the testimony to be improper.

27.     While these cases provide some guidance, the Court does not find them to be dispositive of the issue here.  For example, the court in Elcock focused on the *methodology* applied by the vocational rehabilitation expert, and not entirely on the *data*

*or assumptions* relied upon, as is the case here.  In <u>Benjamin</u>, the focus was really on the qualifications of a certified public accountant to conduct a vocational assessment and estimate an economic loss, and not the reliability of the data used, as is the question here. Finally, in <u>Gumbs</u>, the data utilized by the proffered expert was problematic because it erred in including the plaintiff's entire life span as opposed to his work-life expectancy and because the data utilized inflated the plaintiff's actual income and added fringe benefits that the plaintiff had never received.

28.     Here, as discussed above, Dr. Gamboa did not calculate a full year's expected salary for each year of Garrett Montgomery's expected entire life, but rather conducted a probability calculation to estimate salary.  Moreover, although the Defendants liken estimating the salary of a person who had never worked before to that of estimating a worker's salary to be higher than his previous salary, the two propositions are distinct.  Here, there is no other choice, as Mr. Montgomery had not completed college when this accident occurred.[4]

29.     The Court finds the facts of this case to be more similar to those of <u>Mecca v. Lukasik</u>, 530 A.2d 1334 (Pa. Super. Ct. 1987), in which an economic expert was called upon to predict the future earnings of five teenagers who had been killed.  In finding that the assumptions regarding the teenagers' incomes was reasonable, the <u>Mecca</u> court noted that they were based on testimony that amounted to "more than the dreams of each

---

    [4]  The Pennsylvania Superior Court has stated that estimating the future wage loss of a youth is not inappropriate.  <u>Mecca v. Lucasik</u>, 530 A.2d 1334, 1339-40 (Pa. Super. Ct. 1987) ("this item of damages [has] not been denied by any court because of the problems of the youth involved").

teenager as supported by his or her parents at trial." Mecca, 530 A.2d at 1340.

Specifically, the Mecca court found acceptable that the expert had looked to not only the

desires of the teenagers that had been conveyed through the testimony of their parents, but

also to testimony with respect to the teenagers' grades, the performance of siblings, and

the educational and vocational backgrounds of their parents. Id.

     30.     In this case, Mitsubishi argues that Mecca is inapplicable because Dr.

Gamboa did not interview Mr. or Mrs. Montgomery or, for that matter, any person

regarding Garrett's career and/or family plans.[5]  Instead, the assumptions about Garrett

Montgomery's career and family choices, as reflected in the November 2005 report, were

given to Dr. Gamboa by the Montgomery's counsel, and allegedly were based upon

information provided to counsel by Garrett's parents.  This information, the Defendants

argue, is not a sufficient factual foundation for the assumption that Garrett Montgomery

would have begun and completed law school and then would have practiced law.  The

Defendants further argue that had Dr. Gamboa had such information, he testified in his

deposition that on his own, i.e., in the absence of the posing of the hypothetical

information by counsel, he would not have made such assumptions in conducting his

analysis.

     31.     Pennsylvania courts have permitted experts to base their projections, and

subsequently testify, on evidence regarding the subject issue of their analysis as long as

---

     [5] In so arguing, the Defendants also refer to Schofield v. Piper Aircraft Corp., No. 87-4581, 1988 WL 62181 (E.D. Pa. June 14, 1988).  In Schofield, the court found that the in-depth testimony of expert and lay witnesses regarding a 24-year old's ambitions to become a pilot was sufficient to sustain the damages that were awarded.

that evidence is on the record.  See Mecca, 530 A.2d at 1339-40; Schofield v. Piper

Aircraft Corp., No. 87-4581, 1988 WL 62181 at * 1 (E.D. Pa. June 14, 1988).  The basic

premise of the Defendants' challenge to Dr. Gamboa's assumptions is that in the

November 2005 Report, Dr. Gamboa included assumptions for which he had no personal

knowledge at the time the report was written.  See Oral Arg. Tr. at 80:20-25; 81:1-7.

32.     The Court does not agree with the Defendants' argument that all of this

"future goals" testimony should have been personally gathered by Dr. Gamboa in

preparing his report.   Although the assumptions relied upon by Dr. Gamboa  must

ultimately be supported by evidence on the record in order for him to testify at trial, the

absence of such precise and exact statements on the record at this time does not now

preclude his testimony here.  Rather, the absence of such testimony will only become an

issue if, at the time Dr. Gamboa is testifying during trial, there is no foundational basis for

the assumptions on which he relied in preparing the November 2005 Report.  Thus,

because the reliability of Dr. Gamboa's testimony cannot be decided at this time, the

motion cannot be granted.

**Assistance to the Jury**

33.     The Defendants finally argue that Dr. Gamboa's testimony will not assist

the jury because the assumptions underlying the analysis do not fit the facts of this case.

As discussed in detail above, it remains to be seen whether the testimony on the record

will support the assumptions.

CONCLUSION

For the reasons discussed above, the Court concludes that because no one

(including this Court ) has seen all of the record evidence that will be presented at trial

with respect to Garrett Montgomery's career and family plans, it would be premature to

exclude the testimony of Dr. Gamboa at this juncture on that basis.  As such, the Motion

will be denied without prejudice.  An appropriate Order follows.


<u>S/Gene E.K. Pratter</u>
Gene E.K. Pratter
United States District Judge

April 27, 2006

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES MONTGOMERY,** | : | **CIVIL ACTION** |
| **JACQUELINE MONTGOMERY** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **MITSUBISHI MOTORS CORP.,** | : | |
| **MITSUBISHI MOTOR SALES OF** | : | |
| **AMERICA, INC. and ANNE STORK** | : | |
| **Defendants.** | : | **NO. 04-3234** |

## O R D E R

     **AND NOW**, this 27th day of April, 2006, upon consideration of the Motion <u>in Limine</u> of Defendants Mitsubishi Motors Corp. and Mitsubishi Motors of North America, Inc., to Preclude the Testimony of Anthony M. Gamboa, it is **ORDERED** that the Motion is **DENIED** without prejudice.  The Defendants are given leave to resubmit the Motion prior to the presentation of Dr. Gamboa's testimony if they deem it appropriate.

                                      BY THE COURT:


                                      <u>S/Gene E.K. Pratter</u>
                                      GENE E.K. PRATTER
                                      United States District Judge