**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES MONTGOMERY,** | : | **CIVIL ACTION** |
| **JACQUELINE MONTGOMERY** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **MITSUBISHI MOTORS CORP.,** | : | |
| **MITSUBISHI MOTOR SALES OF** | : | |
| **AMERICA, INC. and ANNE STORK** | : | |
| **Defendants.** | : | **No. 04-3234** |

Gene E.K. Pratter, J.            Memorandum and Order            July 12, 2006

Defendants Mitsubishi Motors Corporation and Mitsubishi Motors North America, Inc.

(jointly, "Mitsubishi")[1] move to preclude the testimony of Robert Anderson, an automotive

expert witness proffered by the Plaintiffs in this case.  In addition, Plaintiffs James and

Jacqueline Montgomery move to supplement the opinion of Mr. Anderson with information

regarding testing conducted by another vehicle test engineer concerning the same model year

Montero Sport that is the subject of this lawsuit.  If permitted to testify, Mr. Anderson reportedly

will present evidence regarding the engineering stability of the Mitsubishi Montero Sport.  For

the reasons that follow, the motion to preclude Mr. Anderson's testimony will be denied in part

without prejudice and granted in part, and the motion to supplement Mr. Anderson's opinion will

be granted.

---

[1] Although the case is captioned against Mitsubishi Motors Corp. and Mitsubishi Motor
Sales of North America, Inc., the latter organization is now called Mitsubishi Motors North
America, Inc..  Answer to Complaint at 1.  The proper name of this Defendant, Mitsubishi
Motors North America, Inc., will be used throughout this Memorandum.

1

**FACTUAL BACKGROUND**

This action arises out of a fatal auto accident that occurred on July 23, 2002. The Plaintiffs' son, Garrett Montgomery, was a passenger in an MY2000 Mitsubishi Montero Sport when the vehicle was struck by another vehicle driven by Third Party Defendant Anne Stork. The Montero rolled over, and Garrett Montgomery was killed.

The Montgomerys commenced this action with the filing of their Complaint on July 8, 2004, alleging that Mitsubishi caused their son's death by "the design and manufacture of a defective motor vehicle and because of Defendants' negligence, carelessness and reckless disregard for the safety of others." Complaint at ¶ 13. Mitsubishi answered the Complaint on August 19, 2004, asserting various affirmative defenses. The parties have completed discovery, including the depositions of several expert witnesses. Mitsubishi moves for an order excluding the testimony of Robert Anderson, and the Montgomerys have not only responded to the Motion, but have also moved to supplement Mr. Anderson's opinion testimony with information relied upon by Mr. Anderson from testing conducted by an expert in a different case. Oral argument on the motions was held, and the Court's findings of fact and conclusions of law relating to both motions follow.

**A.    FINDINGS OF FACT**

1.    Mr. Anderson holds both bachelor and master of engineering degrees from Arizona State University. R. Anderson Curriculum Vitae at 2. Mr. Anderson has lectured at the College of Engineering and Technology at Northern Arizona University in Flagstaff, Arizona on the topic of mechanical engineering, mechanical engineering technology and computer science. R. Anderson Curriculum Vitae at 1. Mr. Anderson also taught engineering and engineering

2

technology at Northern Arizona University from 1977 until 1984.  Anderson Report at 1.

2.     Mr. Anderson is employed as an engineering consultant by Applied Research & Investigations.  He has worked as a consultant since 1977, specializing in vehicle dynamics, accident reconstruction and the crashworthiness of vehicles.  Anderson Report at 1.  Mr. Anderson describes his career as one that has been involved with automotive safety.  Anderson Report at 1.

3.     Mr. Anderson has previously testified as an expert with respect to automotive safety.  Anderson Report at 1.   He has conducted analyses in approximately 3,000 automobile cases, and he has testified in state, federal or local court cases approximately 100 times. Anderson Curriculum Vitae at 1.

4.     In preparing his initial report in this case, Mr. Anderson reviewed the following materials: (1) the police report for the accident; (2) police photographs; (3) the autopsy of Garrett Montgomery; (4) the vehicle involved in the accident; (5) the scene of the accident; (6) aerial photographs of the scene of the accident; (7) the depositions of Trooper John M. DiPetrillo, Jack Q. Wolfkill, Michelle DeVito,[2] Lauren DeVito,[3] Trooper Frank Weston and Keiji Isoda; (8) a Preliminary Accident Report prepared by Ponderosa Associates Limited, a consulting company that was hired by the Montgomerys to investigate and re-construct the accident; (9) a decoding program information for Vehicle Identification Number information; and (10) vehicle weights, dimensions and other physical characteristics from a database called AUTOSTATS.

5.     Mr. Anderson states that nearly 30 years ago, he became involved in a project

---

[2]  Michelle DeVito was the driver of the Montero Sport involved in this accident.

[3]  Lauren DeVito was a passenger in the Montero Sport involved in this accident.

3

to develop test procedures by which the National Highway Traffic and Safety Administration

("NHTSA") could evaluate the handling safety of certain passenger vehicles.  Anderson Report

at 2.  The project was entitled "Handling Test Procedures for Light Trucks, Vans and

Recreational Vehicles."  Anderson Report at 2.  The testing involved with this project included a

"limit turning response" test, in which a vehicle is turned to a sharp degree until a limit response,

such as drifting, plowing spinning or overturning, is reached.  Id.

6.      In his report, Mr. Anderson recounts his experience in the automotive industry

regarding the phenomenon that some vehicles have the potential to roll over.  Anderson Report at

3.  Mr. Anderson also asserts that over the years, the dynamic tests applied by NHTSA to assess a

vehicle's propensity to roll over have involved testing that included "J-turns" and "fishhook

turns", in which sharp turns of a vehicle on a flat, dry surface are effected to assess how that

vehicle responds.  Id.

7.      Mr. Anderson reports that since the 2001 model year, NHTSA "has addressed the

rollover issue by measuring the static stability factor ("SSF") and publishing it as part of the new

car assessment program."  Anderson Report at 3.  As such, Mr. Anderson asserts that the

NHTSA program "acknowledges that there is a statistical connection between vehicle geometry

and accident rates, particularly single vehicle rollover accidents."  Id.  Mr. Anderson further

asserts that this information is presented to the public via the "star rating system" of vehicles.  Id.

8.      Mr. Anderson further asserts that he is aware that most recently NHTSA

conducted these kinds of tests on a group of 9 sport utility vehicles, 6 pickup trucks, 5 minivans

and 6 passenger cars.  Anderson Report at 3.  Of these vehicles, Mr. Anderson asserts that it is

his understanding that the Montero Sport showed an overturn limit response.  Id.  Mr. Anderson

4

concludes his report by opining that had the Montero Sport "been made wider and lower," it would not have overturned during the accident at issue, and that Mitsubishi erred in designing the Montero Sport because it did not conduct the J-turn and fishhook tests and, as a result of this failure, the vehicle is the product of a defective and unsafe design.  Anderson Report at 4.

9.      Mr. Anderson's assertion in his original report that it is his understanding that the Montero Sport showed an overturn response in limit testing is the source of significant discord between the parties, in particular because the acknowledged source of Mr. Anderson's testimony in this regard is testing conducted by David Bilek, someone who is not identified as a potential expert witness for this case.[4] After subsequently obtaining the data produced by Mr. Bilek's testing, which involved a *non*-four wheel drive Mitsubishi Montero Sport, the Montgomerys moved to supplement Mr. Anderson's testimony with the Bilek data.

10.      The "Bilek testing" that is the source of much of the controversy surrounding Mr. Anderson's report and opinion is comprised of certain tests conducted by another automotive expert in different product liability litigation involving a Mitsubishi Montero Sport 2 X 2, and not a 4 X 4.  The model of the vehicle involved in the accident underlying this dispute was a 4 X 4.  Despite the cornucopia of documents submitted by the parties with respect to the two motions presently before the Court, no party thought to present to the Court a copy of Mr. Bilek's testing, report, results or other detail.[5]  According to Mr. Anderson, the results of Mr. Bilek's testing

---

[4]  Mr. Bilek has been listed as a fact witness by the Montgomerys.  Apr. 5 Tr. at 155:7-8.

[5]  The Court notes that in the Montgomerys' Reply to Defendants' Response in Opposition to their Motion for Leave to Supplement Mr. Anderson's Report, Plaintiffs urge the Court to hold an evidentiary hearing with respect to the Bilek test data.  Such an opportunity was presented to the parties on April 5, 2006, when the hearing on the various Daubert motions was conducted.  However, neither party presented Mr. Anderson or Mr. Bilek for testimony.

support the Anderson theory that the reason that the Montero Sport involved in this accident

rolled over is because it was defectively designed.  See Proposed Supplemental Anderson Report

at 2.

11.     Of the several discovery motions that were filed in this case, the one most

pertinent to the present circumstances is a motion filed by the Montgomerys seeking to compel

the production of the testing completed by Mr. Bilek in another separate lawsuit against

Mitsubishi.  After Mitsubishi responded to that motion, the Court held a teleconference with

counsel and, based on the information that had been provided, denied the motion.  In so ruling,

the Court found that "requiring the production of the requested test materials prepared by an

expert in a case other than this one would not reasonably lead to the discovery of admissible

evidence in this case."  February 7, 2006 Order (Docket No. 37).  The Order further stated that

"the requested materials would be considered hearsay and their presentation at trial would not be

reliable because the Defendants would not have the opportunity to cross-examine the expert who

conducted the testing and produced the materials. . . ."  Id.  From these statements, Mitsubishi

asserts that because the Bilek testing report would itself be inadmissible in this trial, evidence of

any reliance by Mr. Anderson on such testing is equally inadmissible.

12.     Approximately two weeks after the February 7 ruling, on motion of the

Montgomerys for clarification of the February 7 Order, the Court held another teleconference

with counsel to clarify this particular language regarding the Bilek testing.  At that time, the

Court specifically instructed the parties that its ruling was not intended to be a qualitative in

limine ruling on the Bilek testing.  The Court further stated that such an issue should be reserved

for a pretrial motion in limine, which presents itself here in the form of the Montgomerys'

Motion to Supplement Mr. Anderson's Expert Report.

**B.    Conclusions of Law**

**Motion to Exclude Mr. Anderson's Report and Testimony**

1.      Federal Rule of Evidence 702, which governs the admissibility of expert

testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto
> in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to the
> facts of the case.

Fed. R. Evid. 702.

2.      In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the

Supreme Court imposed upon district courts the role of a gatekeeper to "ensure that any and all

scientific evidence is not only relevant, but reliable." ID Sec. Sys. Canada, Inc. v. Checkpoint

Sys., Inc., 198 F. Supp. 2d 598, 601-02 (E.D. Pa. 2002) (quoting Daubert, 509 U.S. at 589); see

also Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).

3.      When "faced with a proffer of expert scientific testimony . . . the trial

judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to

testify to (1) scientific knowledge that (2) will assist the trier of fact to understand and determine

a fact in issue." Id. at 602 (quoting Daubert, 509 U.S. at 592).

4.      This gatekeeping function of the district court extends beyond scientific

testimony to "testimony based on . . . 'technical' and 'other specialized' knowledge." Id.

(quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238

(1999)).

5.      Federal Rule of Evidence 702, as interpreted in Daubert, provides "three

distinct substantive restrictions on the admission of expert testimony: qualifications, reliability

and fit." Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000).  The party offering the expert

testimony has the burden of establishing that the proffered testimony meets each of the three

requirements by a preponderance of the evidence.  ID Sec. Sys. Can., Inc., 198 F. Supp. 2d at 602

(citing Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999)).

### 1.      Qualifications of Mr. Anderson

6.      The first aspect of a Daubert analysis, whether the witness is qualified as

an expert, requires that the witness has "specialized knowledge" about the area of the proposed

testimony.  Elcock v. Kmart Corp., 233 F3d at 741.  The basis of such knowledge may include

"practical experience as well as academic training and credentials." Id.   This requirement has

been interpreted liberally to encompass "a broad range of knowledge, skills, and training." Id.

(quoting Waldorf v. Shuta, 142 F.3d 601 (3d Cir. 1998)).

7.      Mitsubishi does not challenge Mr. Anderson's qualifications to testify as an

expert, but rather challenges whether the tests he conducted are relevant to this case.  Therefore,

the Court need not address the propriety of Mr. Anderson's expert qualifications at length.  The

Court simply notes that Mr. Anderson's education and experience are sufficient to qualify him as

an expert regarding vehicle handling and safety.

### 2.      Reliability of Mr. Anderson's Opinions

8.      The second Daubert prong requires an expert's testimony to be reliable.

8

 Id.  When an expert testifies to "scientific knowledge," the expert's opinions "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief."  In re Paoli Railroad Yard Litigation, 35 F.3d 717, 743 (3d Cir. 1994).  The Supreme Court has opined that a district court "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  Id. (citing Kumho Tire, 526 U.S. 137 (1999)).  That is to say, a trial court should consider the specific factors identified in Daubert where they are "reasonable measures of the reliability of expert testimony."  Kumho Tire, 526 U.S. at 152.

9.     In considering whether there are "good grounds" for an expert's opinions, and, therefore, whether the opinion meets the reliability requirement, district courts are to look at a series of factors, including:

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

In re Paoli, 35 F.3d at 742 n.8.  This list of factors "is non-exclusive and . . . each factor need not be applied in every case."  Elcock, 233 F.3d at 746.[6]

---

[6]  Nonetheless, to the extent the Daubert factors are "reasonable measures of the reliability" of an expert's testimony, they should be considered by the district court.  Elcock, 233 F.3d at 746.

10.     The factors set forth in Daubert are not to be applied rigidly in all cases. See, e.g., United States v. Davis, 397 F.3d 173, 178 (3d Cir. 2005) ("Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case") (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999)). A trial court has some latitude in determining what it needs in order to investigate the reliability of a proposed expert, and where the reliability of a witness's testimony depends heavily on only the knowledge and experience of the expert, some courts have found that the Daubert factors are not always applicable. See, e.g., United States v. Hankey, 203 F.3d 1160, 1169 (9th Cir. 2000) (noting that Daubert factors were not applicable to testimony of police officer who testified based on his current and past communications with gang members and gang officers). In cases where the specific Daubert/Kumho Tire factors do not provide sufficient or relevant guidance for a court to assess the reliability of proposed expert testimony, the reliability assessment must focus "upon personal knowledge and experience." See, e.g., Roberson v. City of Philadelphia, No. 99-3574, 2001 WL 210294, at * 3 (E.D. Pa. Mar. 1, 2001) (noting that Daubert does not provide sufficient guidance where evidence is non-scientific in nature).

11.     Mitsubishi argues that Mr. Anderson's opinions regarding the defective design of the Montero Sport are not reliable for three reasons. Mitsubishi first argues that Mr. Anderson's approach to determining a defective design is not accepted in the motor vehicle engineering community, but rather has been generated only for the purpose of litigation. Mitsubishi next argues that Mr. Anderson's opinions that the Montero Sport was defective in its design must be excluded because Mr. Anderson has never performed any actual testing on the Montero Sport. Mitsubishi finally argues that Mr. Anderson's reliance on testing conducted by David Bilek is

invalid because (1) Mr. Bilek tested a two-wheel drive, and not a four-wheel drive, Montero

Sport; (2) Mr. Anderson had not reviewed the testing conducted by Mr. Bilek before relying on it

in preparing his report; and that (3) a prior ruling of this Court has directed that Mr. Bilek's

testing is not related to this case.  These arguments are addressed in turn.

<h3 style="text-align:center">a.      Non-acceptance of Criteria/Lack of Actual Testing</h3>

12.      Although Mr. Anderson is an engineer, the nature of the expert opinion he

renders in this case is somewhat non-scientific.  For example, in his report, Mr. Anderson states

that "Mitsubishi did not design the Mitsubishi Montero Sport to withstand limit turning

conditions and did not test the vehicle in the limit to confirm it passed a test like the fishhook or

J-turn." <u>Anderson Report</u> at ¶ 12. Mr. Anderson further states that "[t]his failure to design and

test for overturn stability resulted in a defective and unsafe design." <u>Id</u>.  In preparing his report

for this case, Mr. Anderson reviewed various statements and depositions, as well as the accident

scene. <u>Anderson Report</u> at 1.  In the substantive text of the report preceding Mr. Anderson's

conclusion, it is clear that Mr. Anderson arrived at these conclusions not based on any specific

testing that he conducted, but rather on Mr. Anderson's experience as an engineer in the

automotive industry with a particular focus on the evolution of limit testing that has been

conducted by NHTSA and other automobile manufacturers over the past 20 years.

13.      Considering the depth of Mr. Anderson's experience and qualifications in the

automotive industry, he appears to have a base of knowledge upon which he could form an

opinion that, based on what he knows of the testing conducted on the Montero Sport during its

design phase, the Montero Sport was not properly designed.  After reviewing Mr. Anderson's

expert report and reviewing his <u>curriculum vitae</u> and the other documents submitted in

11

conjunction with this motion, the Court does not agree that Mr. Anderson's opinion about the Montero Sport is unreliable for immediate evaluative purposes.  The Court's role in addressing a <u>Daubert</u> motion is not that of an advocate, but rather an arbiter.   While Mr. Anderson's rather open-ended opinions may appropriately be challenged through the cross-examination process at trial, the assertions are based on his years of experience and are not purely speculative or conjectural.[7]

### b.      Relation of Data to this Case

14.     Mitsubishi next argues that Mr. Anderson's opinion regarding the alleged defective design of the Montero Sport 4 X 4 must be excluded because the "Bilek testing" upon which Mr. Anderson purports to base his opinion is not related to this case and, therefore, is not reliable.  Mitsubishi further argues that, in fact, this Court, in disposing of a previous motion, ruled that the testing conducted by David Bilek does not apply here.

15.     The Court does not agree that the purported inadmissibility of the Bilek data itself thwarts reliance on the data by Mr. Anderson.  Federal Rule of Evidence 703 states that "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data [relied upon by an expert] need not be admissible in evidence in order for the opinion or inference to be admitted."  FED. R. EVID. 703.  The inadmissible data itself, however, should not be disclosed to the jury unless its probative value substantially

---

[7]  The Court notes that, somewhat ironically, had Mr. Anderson conducted actual testing that was completely unorthodox or far outside the parameter of professional reason in order to arrive at his conclusion, exclusion might have been warranted.  While the lack of actual testing may be a primary focus for Mitsubishi's counsel at trial, the Court sees the opinions set forth in Mr. Anderson's report as the product of an experienced professional's review of certain documents and data related to the incident in dispute and that professional's subsequent opinion based upon that review.

outweighs the prejudicial effect of its admission.  Id.

16.     Mr. Anderson refers to the report prepared by Mr. Bilek in two places.  In his initial report, without naming Mr. Bilek, Mr. Anderson states that it is his understanding that "[l]imit performance testing of the Montero Sport shows that the vehicle exhibits an overturn limit response."  Anderson Report at 3.[8]  The testing is again referred to in Mr. Anderson's Supplemental Expert Report which the Montgomerys now move to have included in the proffered testimony.[9]  Significantly, neither of the reports prepared by Mr. Anderson attaches Mr. Bilek's report or includes the specific data or analysis conducted by Mr. Bilek.  Based on this presentation, the Court concludes that to the extent that Mr. Anderson merely considered Mr. Bilek's analysis and conclusions in preparing his (Mr. Anderson's) report, the substance of Mr. Anderson's report is sufficient to meet minimum reliability requirements.  However, if at trial the Montgomerys attempt to introduce Mr. Bilek's actual testing into the evidence through direct examination of Mr. Anderson, evidence with respect to specific information about Mr. Bilek's testing will need to meet its own admissibility testing.

17.     Mitsubishi next argues that Mr. Anderson's report is not reliable because he has not demonstrated how his proposed alternative design would perform in the limit testing or in an accident such as the one giving rise to this case.  To support this argument, Mitsubishi relies on

---

[8]  That Mr. Bilek's testing was the source of this statement came to light at Mr. Anderson's deposition, in which he stated that until that day, he had not spoken with Mr. Bilek about the testing he had conducted, and that he had only been advised of the testing by the Montgomerys' counsel.  R. Anderson Dep. at 13:2-9.  Mr. Anderson then had a conversation with Mr. Bilek about the testing just prior to having his deposition taken.  R. Anderson Dep. at 15:3-5.

[9]  The Motion to Supplement Mr. Anderson's report is discussed below.

Zaremba v. General Motors Corp., 360 F.3d 355, 358 (2d Cir. 2004).

18.     In Zaremba, the estate of a driver who was killed, as well as two passengers who were injured in a single-car rollover accident, sued General Motors, arguing that had the plaintiffs been driving a vehicle of an alternative safer design, their injuries would have been less severe. Zaremba, 360 F.3d at 356-57.  In preparing for trial, General Motors moved to exclude the testimony of the plaintiffs' expert, arguing that his testimony was unreliable because the expert (1) had not examined or tested the car model at issue; (2) had no measurements or calculations to support his theory of how the accident occurred; (3) made no drawing or model (i.e. prototype) of the hypothetical alternative design he proposed; (4) conducted no test of his design; (5) offered no calculations in support of the safety of his design; (6) had not subjected his alternative design to peer review and evaluation; and (7) presented no evidence that other designers or manufacturers in the automobile design community accepted the untested propositions underlying his opinions. Zaremba, 360 F.3d at 357.  The court agreed, finding that the proposed testimony was "based on unfounded speculation" and was, therefore, unreliable under Daubert.

19.     The Court of Appeals for the Third Circuit has not set forth a precedential opinion with respect to the need for viability of an expert's proposed alternative design.  However, that court recently addressed the issue in Simmons v. Ford Motor Co., 132 Fed. Appx. 950 (3d Cir. 2005), a non-precedential opinion.  In Simmons, the court affirmed the trial court's exclusion of the testimony of an expert who had not proved that a practical and feasible alternative design would have reduced or prevented the harm.  Simmons, 132 Fed. Appx. at 952.  Simmons does not provide clear guidance, however, as that case was decided pursuant to a specific New Jersey

law that imposes the burden of proving such a design on a plaintiff asserting a defective design.
Id. at 953.

20.    Pennsylvania law does not appear to have a directly analogous provision to the
New Jersey statute.[10]  Thus, the Court must attempt to predict what the Pennsylvania Supreme
Court would decide in a case such as this one, where the plaintiff asserts a theory of defective
design and presents an expert who would opine as to a general design that, he believes, would
have fared better in the same circumstances, and whether the Pennsylvania Supreme Court would
require the expert to have modeled and tested the proposed design.

21.    In light of the court's reasoning in Simmons and considering the requirement
under Pennsylvania law that such a test be conducted to establish the adequacy of the proposed
design in cases involving crashworthiness, the Court concludes that the law demands more of the
plaintiff asserting an alternative design than is present on this record.  Mr. Anderson's singular
statement that "[i]f the Mitsubishi Montero Sport had been made wider and lower, it would not
have an overturn limit response" is, at best, a conclusory statement that provides no specific
information regarding whether and how such an alternative design would have prevented this
accident from occurring.  As such, the Court holds that because Mr. Anderson conducted no

---

[10]  Under Pennsylvania law, a plaintiff asserting a claim for lack of crashworthiness
of a vehicle must show (1) the design of the product was defective; (2) when the design was
made, an alternative, safer design, practicable under the circumstances existed; (3) what injuries,
if any, the plaintiff would have received had the alternative, safer design been used; and (4) what
injuries were attributable to the defective design.  Barker v. Deere and Company, 60 F.3d 158,
161 n.3 (3d Cir. 1995).  Thus, the existence of an alternative, safer design is an element that the
Montgomerys would need to prove in order to prevail on a claim based crashworthiness. At oral
argument on this motion, counsel for the Montgomerys reiterated that the sole basis for their
claim is that of a design defect and that their theory of liability on this case is **not** that the
Montero Sport 4 X 4 was not crashworthy.  Apr. 5 Tr. at 28:22-25.  This assertion remains a
point of contention between the parties.  Apr. 5 Tr. at 59:3-10.

testing to support such a statement, this portion of his report and testimony will be excluded.

### 3.    Assistance to the Jury

22.    The final prong of the Daubert analysis requires that the expert testimony "fit" by assisting the trier of fact. Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir. 2000). "Admissibility thus depends in part upon 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" In re Paoli, 35 F.3d at 743. The "fit" standard does not require plaintiffs to prove "their case twice." Oddi, 234 F.3d at 145. They need not "demonstrate to the judge by a preponderance of evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that they are reliable." In re Paoli, 35 F.3d at 744. Thus, the test does not require that the opinion have "the best foundation" or be "demonstrably correct," but only that the "particular opinion is based on valid reasoning and reliable methodology." Oddi, 234 F.2d at 146. In assessing "fit," a court must "examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." Id.

23.    Mitsubishi does not argue that Mr. Anderson's report and testimony must be excluded because it will not assist the jury, so the Court need not address this prong at length. However, the Court notes that the depth of Mr. Anderson's experience in testing and reviewing the testing of the safety and handling performance of vehicles will serve to assist the jury in assessing the characteristics of the vehicle in question in this case. For this reason, the substance of Mr. Anderson's report, as delineated above, sufficiently fits the facts of this case.

MOTION TO SUPPLEMENT MR. ANDERSON'S EXPERT REPORT

24.     The Montgomerys seek leave of Court to allow Mr. Anderson to supplement his

expert report.  The proposed supplemental report is an approximately two-page letter in which

Mr. Anderson discusses his review of Mr. Bilek's testing, states that it is his opinion that the

testing is "both reliable and standard in the safety/testing community," and that the Bilek testing

confirms Mr. Anderson's expert opinion that the Montero Sport involved in this accident rolled

over because of a design flaw – that is, an unreasonably low static stability factor.  Anderson

Supplemental Report at 2.

25.     Federal Rule of Civil Procedure 26(a)(2)(C), which addresses disclosure

of expert testimony, allows for discovery disclosures to be made "at the times and in the

sequence directed by the court," and calls for supplemental disclosures "when required under

subdivision (e)(1).  FED. R. CIV. P. 26(a)(2)(c).  In turn, Federal Rule of Civil Procedure 26(e)(1)

imposes a duty upon an expert witness to supplement such disclosures if information contained

in the expert report or information provided through a deposition of the expert is found to be

incomplete or incorrect in some material respect and "if the additional or corrective information

has not otherwise been made known to the other parties during the discovery process or in

writing."  FED. R. CIV. P. 26(e)(1).

26.     In vigorous opposition to the motion to supplement, Mitsubishi argues that Mr.

Anderson should not be permitted to supplement his report because (1) Mr. Bilek's testing is not

relevant to this case and that the Court has already set forth this ruling by denying the

Montgomerys' Motion to Compel Mr. Bilek's report;[11] (2) Mitsubishi would be unfairly prejudiced were the Bilek testing to be incorporated into Mr. Anderson's report and permitting the supplement at this point in the litigation would disrupt the trial and the Montgomerys' failure to adhere to the Court's Scheduling Order contravenes Federal Rule of Civil Procedure 37; and (3) the Montgomerys' counsel has not acted in good faith in seeking this supplement.[12]  The Defendants further argue that Mr. Bilek's testing should not be admitted in this case because Mr. Bilek tested a different model of the Montero Sport at issue in this case, which would only serve to confuse the jury.

        27.     As discussed above, Mr. Anderson's proposed supplemental report does not present the testing conducted by Mr. Bilek, but rather states Mr. Anderson's belief that the results of that testing confirm his opinions with respect to the Montero Sport.  Under Federal Rule of Evidence 703, this reliance is permissible.  That the vehicle which Mr. Bilek tested was not the same model of Montero Sport as the vehicle involved in the accident at issue is a notable fact upon which Mr. Bilek's conclusions (and Mr. Anderson's reliance upon them) can be energetically challenged on cross-examination.  Thus, the relevance and similarity to this case of Mr. Bilek's testing have been and will again be addressed.

        28.     The Court must next consider whether the introduction of the proposed

_____

        [11]  Both counsel in this matter repeatedly assert that the Court held telephonic "hearings" on the Plaintiff's Motion to Compel and subsequent Motion for Clarification.  Plaintiffs' Memorandum at 7; Defendants' Memorandum at 5 n.3.  However, the Court held teleconferences, and not hearings, with respect to these motions.

        [12]  According to the Scheduling Order, which was amended, the Plaintiffs were to have served the Defendants with their expert reports on or before October 31, 2005.  Scheduling Order at ¶ 3 (Docket No. 28).

supplemental report at this stage of the litigation would visit prejudice upon Mitsubishi.  Federal

Rule of Civil Procedure 37(b)(2)(B) states that if a party fails to obey an order entered pursuant

to Rule 26(f), the court in which the action is pending may issue "[a]n order refusing to allow the

disobedient party to support or oppose designated claims or defenses, or prohibiting that party

from introducing designated matters in evidence."  FED. R. CIV. P. 37(b)(2)(B).  Exclusion of

evidence for this reason, however, is "an extreme sanction" that is rarely imposed.  Shalley v.

City of Philadelphia, No. 94-5883, 1996 WL 210795 at * 2 (E.D. Pa. Apr. 30, 1996).

29.     There are four factors a district court should consider in deciding whether to

exclude testimonial or equivalent evidence as a sanction for disobeying a court's order: (1) the

prejudice or surprise in fact of the party against whom the excluded witnesses would have

testified; (2) the ability of that party to cure the prejudice; (3) the extent to which waiver of the

rule against calling unlisted witnesses would disrupt the order and efficient trial of the case or

other cases in the court; and (4) bad faith or willfulness in failing to comply with the court's

order.  Shalley, 1996 WL 210795, at * 2 (citing In re Paoli Railroad Yard PCB Litigation, 35

F.3d 717, 791 (3d Cir. 1994)).[13]

---

[13]  In support of their respective arguments, each party has cited to various cases,
none of which are dispositive here.  For example, in Wilson v. Sundstrand, Nos. 99-6944, 6946
2003 WL 22012673 at * 7 (N.D. Ill. Aug. 25, 2003), a case relied upon by the Montgomerys, an
expert supplemented his report with information not contained in the original report five days
after his deposition.  In concluding that the supplement was not improper, the Wilson court noted
that the circumstances were not such that the expert's original report was deficient and the
proponent was attempting to cure a deficiency.  Id. at * 8.  In Allstate Ins. Co. v. Maytag Corp.,
No. 98-1462 1999 WL 203349 (N.D. Ill. Mar. 30, 1999), another case relied upon by the
Montgomerys, the supplemental expert report in question was submitted four days *prior* to the
close of discovery, rather than four months later, as is the case here.

Likewise, in Oliver v. Ingber, No. 96-4471, 1998 WL 107299 (E.D. Pa. Mar. 9,
1998), a case cited by Mitsubishi, the plaintiff allowed the scheduling deadline to pass without

30.     In this case, allowing the proposed report to supplement Mr. Anderson's original report will not serve to work severe prejudice on Mitsubishi.  The element of surprise to Mitsubishi is thoroughly dampened not only because Mitsubishi has long been aware that the Montgomerys were trying to obtain a copy of the Bilek testing and that Mr. Anderson had relied on this testing in drafting his original report, but also because Mr. Bilek's actual data is not included in the proposed supplemental report.  Rather, Mr. Anderson states that the outcome of Mr. Bilek's testing confirms why, in Mr. Anderson's opinion, the vehicle involved in this accident rolled over.  Thus, Mr. Anderson is simply relying upon Mr. Bilek's testing to support his conclusions, which, based on his original report, are drawn from his years of experience.  As discussed previously, any prejudice effected by this type of open-ended statement in the proposed supplemental report may be extensively addressed by Mitsubishi's able counsel during cross-examination at trial.  Moreover, to alleviate any potential prejudice, the Court will consider, to the extent that the parties find it necessary, a motion to allow the deposition of Mr. Bilek so that the testing upon which Mr. Anderson relies may be better understood.

31.     Allowing the Montgomerys to supplement Mr. Anderson's report will also not lead to disruption of the trial or detract from judicial economy.  The Montgomerys have not indicated that they wish to call Mr. Bilek as a witness in this case, and Mr. Anderson has been previously identified as an expert witness likely to testify at trial.  Thus, there is no concern

---

even designating an expert and then attempted a late introduction of an expert.  In Tunis Bros. Co., Inc. v. Ford Motor Co., 124 F.R.D. 95, 96 (E.D. Pa. 1989), also cited by Mitsubishi, the plaintiff identified an expert within the time frame required by the pre-trial scheduling order, and attempted to introduce another expert nearly six months later.  The present case is dissimilar because Mr. Anderson's proposed testimony, as well as his initial report, was disclosed in a timely manner pursuant to the Court's Scheduling Order.

regarding the addition of witnesses at this time.

32.     Finally, the Court does not agree with Mitsubishi that the Montgomerys' counsel acted in bad faith in submitting the proposed supplemental report at this time.  Although it would have been better for all parties, including the Court, had the proposed supplemental report been submitted earlier, the timing of the present circumstances has been explained by the Montgomerys' various attempts to obtain a copy of the Bilek testing results.

33.     In short, because Mitsubishi will not suffer significant prejudice from the submission of the supplemental report, which supplement simply articulates Mr. Anderson's reliance on Mr. Bilek's testing in forming his own opinion, the Montgomerys' motion to supplement Mr. Anderson's report will be granted, with the limitations imposed as previously discussed in this memorandum.

## III.   CONCLUSION

For the reasons discussed above, the Court concludes that the expert report and testimony of Robert Anderson, with the limitations previously delineated, is reliable and will assist the jury. Therefore, Mitsubishi's motion to exclude the testimony will be granted in part and denied in part without prejudice.  The Montgomerys' motion to supplement Mr. Anderson's report will be granted.  An appropriate Order follows.

S/Gene E.K. Pratter
Gene E.K. Pratter
United States District Judge

July 12, 2006

21

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES MONTGOMERY,** | : | **CIVIL ACTION** |
| **JACQUELINE MONTGOMERY** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **MITSUBISHI MOTORS CORP.,** | : | |
| **MITSUBISHI MOTOR SALES OF** | : | |
| **AMERICA, INC. and ANNE STORK** | : | |
| **Defendants.** | : | **NO. 04-3234** |

**O R D E R**

     **AND NOW**, this 12th day of July, 2006, upon consideration of the Motion in Limine of

Defendants Mitsubishi Motors Corp. and Mitsubishi Motors of North America, Inc., to Preclude

the Testimony of Robert Anderson (Docket No. 41), the responses thereto (Docket Nos. 53, 65,

73, 79), and the Motion of the Plaintiffs James and Jacqueline Montgomery for Leave to

Supplement Expert Opinions of Robert Anderson (Docket No. 49), the responses thereto (Docket

Nos. 57, 60)[14] and after hearing oral argument on both Motions, it is **ORDERED** that:

    1.    The Motion to Preclude the Testimony of Robert Anderson is **GRANTED** in part

    and **DENIED** in part.  The Motion is **GRANTED** to the extent that Mr. Anderson

    planned to present testimony with respect to an alternative design for the Montero

    Sport or to present the results and/or process of the testing conducted by Mr.

    Bilek.  The Motion is otherwise **DENIED** without prejudice.  Mr. Anderson may

    may testify regarding his opinion that Mitsubishi defectively designed the

---

[14] Docket Number 57, although filed as a separate motion, is a response to the Plaintiffs' Motion for Leave to Supplement.  Therefore, this motion is also decided here.

Montero Sport and that he did rely on the testing conducted by Mr. Bilek in preparing his report for this case.  Mitsubishi may revisit the motion at the time of trial if during Mr. Anderson's testimony, counsel for the Montgomerys attempts to utilize Mr. Anderson as a vehicle to present Mr. Bilek's testing procedures and opinion.

2.      The Montgomerys' Motion for Leave to Supplement the Expert of Opinions of Robert Anderson is **GRANTED**.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge